1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

8
9
10

| | |
|---|---|
| ESTATE OF VIANNA GRANILLO, by and through its successor in interest, A.A., et al. , <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN DIEGO, et al., <br><br> Defendants. | Case No.:  24-cv-0071 W (SBC) <br><br> **ORDER (1) DENYING IN PART AND GRANTING IN PART THE COUNTY DEFENDANTS' MOTION TO DISMISS [DOC. 43] AND (2) DENYING NAPHCARE DEFENDANTS' MOTION TO DISMISS [DOCS. 45, 48].** |

11
12
13
14
15
16
17
18

19     Pending before the Court are two motions to dismiss Plaintiffs' Third Amended
20  Complaint under Federal Rule of Civil Procedure 12(b)(6). Plaintiffs oppose the motions.
21     The Court decides the matter on the papers submitted and without oral argument.
22  *See* Civ.L.R. 7.1(d)(1). For the following reasons, the Court **DENIES IN PART** and
23  **GRANTS IN PART** the County Defendants' motion to dismiss [Doc. 43] and **DENIES**
24  the NaphCare Defendants' motion to dismiss [Doc. 45, 48].

25

26  ## I.    FACTUAL BACKGROUND

27     Because Plaintiffs' factual allegations are assumed true on a motion to dismiss, the
28  following factual background is taken from the Third Amended Complaint ("TAC").

This lawsuit arises from the death of Vianna Granillo while in the Custody of the County of San Diego at the Las Colinas Detention Center. (*TAC* [Doc. 40] ¶ 20.) Plaintiffs are Ms. Granillo's minor son, A.A., acting through his Guardian Ad Litem, Beverley Alanjary, and Ms. Granillo's mother, Diana Sanchez. (*Id.* ¶¶ 21, 22.) They allege Ms. Granillo was arrested without probable cause and then Defendants failed to provider her with adequate medical care.

At the time of her death, Ms. Granillo was 25 years old and struggled with drug addiction. (*Id.* ¶ 1.) The TAC alleges she died from "complications related to untreated drug withdrawal and possibly alcohol withdrawal." (*Id.*) The month before Ms. Granillo's death, Defendants NaphCare, Inc. and/or NaphCare of San Diego, LLC (collectively, "NaphCare") entered into a contract with Defendant County of San Diego "for the provision of medical treatment to inmates at San Diego County jails." (*Id.* ¶ 130.)

### A.    COWS and CIWA-Ar Scoring.

Relevant to Plaintiffs' claims for the failure to provide adequate medical care to Ms. Granillo are two quantification or scoring tools referred to as COWS and CIWA-Ar. These tools are used to monitor people at risk of withdrawal from drugs or alcohol in settings such as correctional facilities. (*TAC* ¶ 50.) COWS is used to monitor withdrawal related to opioids, while CIWA-Ar is used to monitor withdrawal from alcohol. (*Id.*) These scoring tools work by allowing medical providers to objectively assess the severity and progression of withdrawal symptoms over time and help medical providers recognize when withdrawal is progressing to more advanced stages, requiring an inmate's transfer to a higher level of care, such as an emergency department. (*Id.*)

COWS consists of the following 11 items that are periodically monitored and "scored" on a scale of 1–4 or 1–5 for the inmate: (1) resting pulse rate; (2) the severity of sweating, if any; (3) restlessness; (4) pupil size; (5) bone or joint aches; (6) runny nose or tearing; (7) GI upset; (8) tremors; (9) yawning; (10) anxiety or irritability; and (11) "gooseflesh skin." (*TAC* ¶ 51.) CIWA-Ar consists of the following 10-items periodically

2

1   monitored and scored: (1) nausea / vomiting; (2) tremors; (3) anxiety; (4) agitation; (5)

2   paroxysmal sweats; (6) orientation; (7) tactile disturbances; (8) auditory disturbances; (9)

3   visual disturbances; and (10) headaches. (*Id.* ¶ 52.)

4       According to the TAC, COWS and CIWA-Ar should be administered at least every

5   four hours to a person at risk of withdrawing, and more frequently (such as every hour) if

6   a person is ill or exhibiting more severe symptoms of withdrawal. (*TAC* ¶ 53.) This

7   allows for changes in symptoms to be monitored over time. (*Id.* ¶ 54.) Otherwise, the

8   increase in the severity of a patient's symptoms may be missed. (*Id.*)

9       The use of COWS and CIWA-Ar scoring is also important in a correctional setting

10  because it allows symptoms to be consistently scored and monitored by multiple

11  personnel over multiple shifts. (*TAC* ¶ 54.) This allows an inmate's progression, and

12  worsening withdrawal symptoms, to be evaluated consistently and the treatment regimen

13  modified as needed based on the score. (*Id.*) Additionally, because the severity of a

14  COWS or CIWA-Ar score typically dictates the type of treatment administered to the

15  person suffering from withdrawal, when the scores become too high, transfer to a high

16  level of care (e.g., the emergency department) is immediately required. (*Id.* ¶ 55.)

17

18      **B.**    **<u>Mr. Granillo is arrested and taken to the San Diego County Jail.</u>**

19      According to the TAC, "[o]n July 8, 2022, Ms. Granillo and her boyfriend, the

20  father of [Plaintiff] A.A., were sleeping in their new residence peacefully and without

21  incident. During the execution of a search warrant for another individual," Defendant

22  Deputy Aguirre arrested Ms. Granillo "for violating a restraining order." (*TAC* ¶¶ 45, 46.)

23  However, the TAC alleges Deputy Aguirre was "aware that the terms of the restraining

24  order had been downgraded to a peaceful contact order," which "allowed Ms. Granillo to

25  have contact with her boyfriend as long as all contact was peaceful, which was the case

26  on July 8, 2022." (*Id.* ¶ 46.) Plaintiffs also allege Deputy Aguirre and DOE deputies were

27  aware of the terms of the restraining order and Ms. Granillo's probation, and that Ms.

28  Granillo and her boyfriend advised them about the about the terms. (*Id.* ¶ 47.) Despite

knowing Ms. Granillo was not violating the restraining order or the terms of her probation, Deputy Aguirre and the Doe Deputies arrested Ms. Granillo. (*Id.* ¶ 48.)

After her arrest, Ms. Granillo was taken to the San Diego County Jail ("SDCJ"). (*TAC* ¶ 49.) Because she had previously been an inmate, Ms. Granillo had a jail medical file that "noted" she was an opiate addict and "was administered withdrawal medications immediately upon booking." (*Id.*)

At 10:00 a.m., Defendant RN Amy Vanbeekom began Ms. Granillo's intake screening process. (*Id.* ¶ 57.) According to the TAC, the nurse "noted" the following: "Ms. Granillo had a history or risk or alcohol or drug withdrawal[;]" she "reported using 2 grams of Fentanyl daily and her last use was at 5:00 a.m.[;]" she used fentanyl for the last 6 months; and Ms. Granillo drank "every night with her last drink occurring last night." (*Id.*) The nurse also administered a urine drug test, which showed Ms. Granillo was "positive for methamphetamine, marijuana, MDMA (Ecstasy), amphetamine, and fentanyl." (*Id.* ¶ 61.)

Ms. Granillo's mental health was also assessed. (*TAC* ¶ 60.) She reported attempting to commit suicide within the last three weeks while under the influence of fentanyl and "White," and she "reiterated that she used opioids daily." (*Id.*)

RN Vanbeekom also "completed a 'comprehensive detox screen' for Ms. Granillo," but the "responses to questions related to alcohol withdrawal screening are all blank." (*TAC* ¶ 59.) Only the portion related to opiate withdrawal screening was completed. (*Id.*) The nurse also "indicated that she 'completed' a COWS scoring sheet for Ms. Granillo," but the COWS scoring sheet was left blank. (*Id.* ¶ 58.) "It simply stated, 'Patient not assessed. Reassess in 4 hours.'" (*Id.*) However, the TAC alleges Ms. Granillo was never assessed. (*Id.*)

Fifty minutes after RN Vanbeekom's screening, Ms. Granillo was evaluated by Defendant NP French, who again "noted that Ms. Granillo reported significant recent opiate use and noted the plan was to 'initiate COWS assessments.'" (*TAC* ¶ 62.) NP

4

French then ordered medications the TAC alleges are intended to treat gastrointestinal upset resulting from opiate withdrawal symptoms. (*Id.* ¶ 63.)

The TAC alleges that "[a]lcohol withdrawal is [a] serious medical condition that is potentially fatal." (*TAC* ¶ 64.) Plaintiffs contend, however, that NP French did not follow up on RN Vanbeekom's note about Ms. Granillo's alcohol use and "made no inquiry as to why Vanbeekom had not completed the alcohol withdrawal portion of the comprehensive detox screening questionnaire." (*Id.*) Additionally, "[d]espite possessing information that Ms. Granillo drank every day and had just drank the night before, Defendant French made no further inquiry, did not order Ms. Granillo be placed on alcohol withdrawal assessments, and did not order nurses to obtain an initial CIWA-Ar score for Ms. Granillo to determine the severity of Ms. Granillo's symptoms." (*Id.*)

NP French also did not "inquire as to why the COWS scaling sheet was not completed," and failed to "ask for an initial COWS score," meaning that there was also "no effort to tailor a treatment plan for Ms. Granillo based on a COWS score." (*TAC* ¶ 65.) Additionally, although NP French ordered medications for Ms. Granillo, there "was no attempt to have a nurse administer them to Ms. Granillo immediately," and in fact, Ms. Granillo never received any of the medications ordered. (*Id.* ¶¶ 65, 66)

Two days later, on July 10, 2022, Ms. Granillo was evaluated by Dr. Grimaldi through "STATCARE," a type of telehealth service. (*TAC* ¶ 67.) The doctor "noted 'Opiate withdrawal – Patient is on COWS and meets criteria for buprenorphine,'" which the TAC alleges is the "primary medication to treat opioid use disorder and associated acute pain." (*Id.* ¶¶ 67, 71.) Dr. Grimaldi also "documented 'Opiate Withdrawal Assessments per COWS monitoring' in Ms. Granillo's medical chart," though COWS scoring had not been performed. (*Id.* ¶¶ 67, 68.) Additionally, although Dr. Grimaldi was aware Ms. Granillo was at risk of alcohol withdrawal, he did not order a CIWA-Ar score or otherwise order her to be assessed or evaluated for alcohol withdrawal. (*Id.* ¶ 69.) Nor did he make any effort to ensure Ms. Granillo received the medications previously ordered by NP French that still had not been administered.  (*Id.* ¶ 70.)

The next day, Defendant Nurse Vargas-Pippins administered Ms. Granillo's first dose of buprenorphine. (*TAC* ¶ 72.) This was the only dose of medication she received while in custody. (*Id.*) Nurse Vargas-Pippins posted a note in Ms. Granillo's medical chart reflecting that Ms. Granillo stated, "I feel like shit. I've been here for days. I only got the meds now." (*Id.* ¶ 73.) The nurse also took Ms. Granillo's blood pressure, which "was significantly lower than what had initially been recorded during jail intake" three days earlier. (*Id.* ¶ 74.) According to the TAC, "[d]ehydration is the most common cause of hypotension, or low blood pressure." (*Id.*) "Despite these alarming red flags regarding the state of Ms. Granillo's health, and the lack of treatment she had received for withdrawal, Defendant Vargas-Pippins took no action," such as referring Ms. Granillo to a higher level of care or alerting the doctor. (*Id.*)

Under "assessment" on Ms. Granillo's medical note, Nurse Vargas-Pippins indicated that she was at: "Risk of injury[,] Risk of body temp imbalance[,] Risk of disturbed sensory perception[,] Risk of seizure[,] Alt health maint (Altered health maintenance)." (*TAC* ¶ 75.) However, the nurse's notes indicated that she did not personally observe or measure Ms. Granillo with nausea, vomiting, diarrhea, abdominal pain, tremors, or falling. (*Id.*) Nevertheless, the TAC alleges that based on information and belief, Ms. Granillo was experiencing severe nausea, vomiting and diarrhea, all of which went unnoticed and untreated, resulting in severe dehydration. (*Id.* ¶ 76.)

### C. Ms. Granillo is found unresponsive in her cell.

At approximately 2:04 a.m. the next morning, Ms. Granillo was found unresponsive on the toilet by a Doe Defendant deputy. (*TAC* ¶ 78.) She had shallow breathing, a faint pulse and was gasping for air. (*Id.*) Two DOE Defendant deputies removed Ms. Granillo from the toilet and dragged her into the main module, where they administered two doses of Narcan to no effect and used smelling salts to try to revive Ms. Granillo. (*Id.* ¶ 79.) The TAC alleges the deputies failed to place Ms. Granillo in the recovery position and failed to adhere to the Sheriff Department's policy, "Code Blue:

life-threatening conditions." (*Id.* ¶ 80.) "They also failed to immediately call 911," instead waiting approximately 6 minutes, and "failed to adhere to their POST academy training regarding basic first aid and CPR." (*Id.*) An oxygen tank was brought but was not working properly and failed to deliver oxygen. (*Id.* ¶ 81.) Additionally, although an Automated External Defibrillator was requested, it was not provided to the deputies. (*Id.*)

By the time paramedics arrived, Ms. Granillo had gone thirteen minutes without necessary medical aid or oxygen. (*TAC* ¶¶ 83, 84.) Ms. Granillo was taken to the emergency department but died the next day. (*Id.* ¶ 85.) Hospital records indicate the cause of death was severe anoxic brain injury, meaning she suffered from irreversible brain damage due to a lack of oxygen. (*Id.*) Additionally, although Nurse Vargas-Pippins noted that she did not observe Ms. Granillo experiencing nausea, vomiting, diarrhea, or abdominal pain, the TAC alleges hospital records indicate "Ms. Granillo's intestines were suffering necrosis from lack of blood and oxygen – a condition associated with excessive diarrhea." (*Id.* ¶¶ 87, 88.)

"The San Diego County Medical Examiner opined that Ms. Granillo's cause of death was septic shock, and listed 'anoxic brain injury,' as a contributing factor." (*TAC* ¶ 89.) The TAC contends the "septic shock was a result of a stomach perforation that was caused by Ms. Granillo's untreated withdrawals which resulted in severe vomiting and diarrhea." (*Id.*) Additionally, the "autopsy further revealed that Ms. Granillo had bilateral pulmonary vascular congestion with mild to moderate edema, meaning too much liquid had collected in Ms. Granillo's lungs. Excessive vomiting can cause an individual to inhale stomach contents while vomiting (aspiration) which can cause fluid buildup in the lungs." (*Id.* ¶ 90.)

### D.    Plaintiffs File this Lawsuit

On January 1, 2024, Plaintiffs filed this lawsuit. On November 19, 2024, Plaintiffs filed the TAC alleging the following causes of action: (1) Fourth Amendment – Unlawful Arrest; (2) Fourteenth Amendment – Objective Indifference to A Serious Medical Need;

7

(3) Fourteenth Amendment – Inadequate Medical and Monitoring Policies under *Monell* Claim; (4) Fourteenth Amendment Failure to Train, Supervise and Discipline (*Monell* and Individual Supervisory Liability); (5) Fourteenth Amendment – Failure to Promulgate Constitutionally Adequate Policies and Protocols – Supervisory Liability; (6) Deprivation of Familial Association; (7) Bane Act – § 52.1; (8) Negligence – § 377.30; and (9) Wrongful Death – § 377.60.

Now pending before the Court are two motions to dismiss. The first motion is by the County of San Diego and its employees: Undersheriff Kelly Martinez; Sheriff Deputy Heather Aguirre; Assistant Sheriffs of Detention Theresa Adams and Erika Frierson; Detentions Commander Frank Clamser; Detentions Commander or Captain Christopher Buchanan; Captains of the Medical Services Division Billy Duke and Kyle Bibel; Chief Medical Officer Jon Montgomery; Director of Nursing Serina Rognlien-Hood; Register Nurse ("RN") Amy Vanbeekom; and Nurse Maria Vargas-Pippins (collectively referred to as the "County Defendants"). The second motion is filed by NaphCare and its employees Nurse Practitioner ("NP") Demechiko French and Physician Thomas Grimaldi (collectively referred to as the "NaphCare Defendants").

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss

The Court must dismiss a cause of action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. *Balisteri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990). In ruling on the motion, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." *Vasquez v. L.A. Cnty.*, 487 F.3d 1246, 1249 (9th Cir. 2007).

8

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this rule to mean that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007). The allegations in the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Although well-pled allegations are assumed true, a court is not required to accept legal conclusions couched as facts, unwarranted deductions, or unreasonable inferences. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

### B.    Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* A public official is entitled to qualified immunity "unless the official's conduct violated a clearly established constitutional right. [Citation omitted.]" *Id.* at 232.

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court mandated a two-step approach to evaluating qualified immunity. First, a court must decide if the facts make out a violation of a constitutional right. *Id.* at 201. If so, the second step is whether the right at issue was "clearly established" at the time of the official's alleged misconduct. *Id*. Whether the governing law was clearly established and whether specific facts constitute a violation of established law are legal determinations. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1106 (9th Cir. 2001).

9

"Clearly established" means "[t]he contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right" with careful consideration to the facts of the particular case. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In determining whether a right is clearly established, courts "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005); *Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002) (looking to "decisions of our sister Circuits, district courts, and state courts" in evaluating if law was clearly established).

## III.   REQUEST FOR JUDICIAL NOTICE

The County Defendants argue the Court should consider the criminal protective orders filed in Ms. Granillo's San Diego Superior Court criminal proceeding in evaluating its motion. (*RJN* [Doc. 43-3] 3:10–19.) The original protective order was issued on November 30, 2020 (*RJN* Ex. B), and was then modified on April 13, 2021 (*Id.* Ex. C). As support, the County Defendants contend these documents are essential to the false arrest claim against Officer Aguirre. (*Cnty Defs' MTD* [Doc. 43-1] n.1.) Plaintiffs respond that considering extrinsic evidence is inappropriate on a motion to dismiss and would require converting the motion to a summary-judgment motion. (*Opp'n to Cnty Defs' MTD* [Doc. 51] 9:24–10:11.)

On a motion to dismiss, a court may take judicial notice of undisputed "matters of public record," but not of disputed facts stated in public records. *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001). Courts may also "consider materials incorporated into the complaint or matters of public record" under the "incorporation by reference" doctrine. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (citation omitted). Such documents include situations where "the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint" and the document is authentic. *Id.* Finally, a court may take notice of proceedings in other

courts "if those proceedings have a direct relation to matters at issue." *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992).

In *Sams v. Yahoo! Inc.*, 713 F.3d 1175 (9th Cir. 2013), plaintiffs sued Yahoo! for producing certain private records pursuant to a subpoena issued by a district attorney in Georgia. The complaint did not attach the subpoenas, but alleged Yahoo! should not have produced the records because the subpoenas were facially invalid. Yahoo! filed a motion to dismiss arguing the subpoenas were facially valid and attached copies of the subpoenas. The district court considered the subpoenas and granted the motion. The Ninth Circuit affirmed, finding the court properly considered the subpoenas because they were "critical" to plaintiffs' lawsuit and there were no factual disputes as to their content. *Id.* at 1179.

In *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018), the Ninth Circuit further clarified "when it is proper to … incorporate by reference documents into a complaint, and when it is not." *Id.* at 999. According to the court, such clarification was necessary given the "overused and improper" application of the doctrine. *Id.* at 998. The court explained that "incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself. The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom— their claims. [Citations omitted.]" *Id.* at 1002. The doctrine applies "'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claims." *Id.* (citing *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)).

Here, Plaintiffs' claims against Deputy Aguirre are based on whether there was probable cause to arrest Ms. Granillo for violating the protective order. The TAC refers extensively to the documents, and claims there was no probable cause because the terms of the protective order allowed for non-offensive contact and Ms. Granillo was arrested while asleep with her boyfriend in their apartment. Because Plaintiffs' claim depends

entirely on the terms of the applicable protective order, the Court finds it is properly considered under the incorporation-by-reference doctrine.

## IV.    ANALYSIS

### A.    First Cause of Action – Section 1983 Unreasonable Seizure against Deputy Aguirre

The first cause of is a section 1983 claim for unlawful arrest against Deputy Aguirre. She argues this cause of action should be dismissed for two reasons. First, Deputy Aguirre contends the TAC fails to state a claim because there was probable cause to arrest Ms. Granillo. (*Cnty Defs' MTD* 13:6–15:15.) Second, Deputy Aguirre contends she is entitled to qualified immunity. (*Id.* 15:16–17:21.)

#### *1.    The TAC sufficiently alleges a Fourth Amendment Violation.*

Deputy Aguirre argues she did not violate Ms. Granillo's Fourth Amendment rights because there was probable cause to arrest for violating the protective order.

Probable cause to arrest is based on an objective standard. *U.S. v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). It exists "when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." *Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007) (citing Du*bner v. City & Cnty. of San Francisco*, 266 F.3d 959, 966 (9th Cir. 2001)). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). However, the information upon which probable cause is based must be reasonably trustworthy. *See Allen v. City of Portland*, 73 F.3d 232, 237 (9th Cir. 1995) ("Probable cause exists when, at the time of arrest, the agents know reasonable trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense.").

12

Here, Deputy Aguirre contends that because the protective orders prohibited Ms. Granillo from having any contact with her boyfriend, there was probable cause to arrest Ms. Granillo when she was found in her boyfriend's apartment. (*Cnty Defs' P&A* 14:3–15.) Plaintiffs respond that probable cause was lacking because the relevant protective order only prohibited negative contact, and Deputy Aguirre was aware of the protective order's terms. (*Opp'n to Cnty Defs' MTD* 11:6–10.) The Court agrees with Plaintiffs.

The original protective order issued on November 30, 2020 was broader than the subsequent protective order. In the original protective order, boxes 7, 12, 13 and 14 were checked, limiting Ms. Granillo's contact with her boyfriend as follows:

> 7.  must not harass, strike, threaten, assault (sexually or otherwise), follow, stalk, molest, destroy or damage personal or real property, disturb the peace, keep under surveillance, or block movements of the protected persons named above.

* * *

> 12. **must have no personal**, electronic, telephonic, or written **contact with the protected persons** named above.

> 13. must have no contact with the protected persons named above through a third party, except an attorney of record.

> 14. **must not come within 100 yards of the protected persons** and animals named above

(*RNJ* Ex. B, emphasis added.) Based on these conditions, particularly those in boxes 12 and 14, Ms. Granillo was prohibited from any contact with her boyfriend. However, the subsequent April 13, 2021 protective order, which was in effect when Ms. Granillo was arrested, changed the type of contact allowed by only prohibiting the following:

> 7.  must not harass, strike, threaten, assault (sexually or otherwise), follow, stalk, molest, destroy or damage personal or real property, disturb the peace, keep under surveillance, or block movements of the protected persons named above.

(*Id.* Ex. C.) Thus, unlike the original protective order, the subsequent order omitted conditions 12, 13 and 14 and thus **no longer** provided that Ms. Granillo "must have no

13

personal . . . contact with" or "must not come within 100 yards of" her boyfriend. Instead, she was only prohibited from the so called "offensive contact" described in box 7. Because the TAC alleges Ms. Granillo and her boyfriend were peacefully sleeping and there was no offensive conduct, there was no probable cause for the arrest.

Nevertheless, Deputy Aguirre asserts the April 13, 2021 protective order was not limited to offensive conduct because the "'peaceful contact' box, box #16, was not specifically marked." (*Cnty Defs' MTD* 15:4–7.)  This argument lacks merit.

Contrary to the County's argument, box 16 does not authorize any and all peaceful contact. Instead, it authorizes "peaceful contact with the protected persons…, as an exception to the 'no contact' or 'stay away' provision in item 12, 13, or 14 of this order, only for the safe exchange of children and court-ordered visitation as stated in" family, juvenile or probate court orders. (*RJN* Ex. C.) In other words, box 16 applies *if* (1) the "no contact" or "stay away" provisions in boxes "12, 13, or 14" are marked, and (2) there exists a child-custody order from a family, juvenile or probate court. Since neither boxes 12, 13 or 14 are marked in the April 13 protective order, and there is no mention in the TAC of a family, juvenile or probate court order regarding the exchange of children or visitation, box 16 does not apply.

Next, Deputy Aguirre asserts probable cause existed because "Judge Francis Devaney of the San Diego Superior Court approved the arrest of Ms. Granillo after reviewing" Deputy Aguirre's Probable Cause Declaration. (*Cnty Defs' MTD* 16:17–20, citing *RJN* Ex. D.) This argument lacks merit for several reasons.

To begin, the Deputy's declaration suggests that the April 13, 2021 protective order prohibited any contact between Ms. Granillo and her boyfriend. (*RJN* Ex. D.) For the reasons just stated, that statement was inaccurate and thus Judge Devaney's determination was based on incorrect information.

Next, the determination of probable cause is based on what the officer knew at the time of the arrest. *See Allen v. City of Portland*, 73 F.3d 232, 237 (9th Cir. 1995) ("Probable cause exists when, at the time of arrest, the agents know reasonable

14

trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense."). Judge Devaney's determination was made after the arrest and thus is not relevant regarding whether the Deputy had probable cause at the time of the arrest.

Finally, regarding the Deputy's other statements in the declaration, they are not included in the TAC and are at odds with the TAC's allegations. For example, while the declaration indicates Ms. Granillo and her boyfriend were found "on the side of the residence next to the trash cans and a bike," the TAC alleges they were in their residence sleeping when the Deputy made contact. (*Opp'n to Cnty Defs' MTD* 11:13–15, citing *TAC* ¶ 140.) On a motion to dismiss, the TAC's factual allegations are assumed true. Thus, the conflicting statements in the Deputy's declaration must be disregarded. Moreover, while the declaration itself may be judicially noticeable, that does not mean the facts stated in the declaration are assumed true. Instead, judicial notice of the declaration simply establishes as a matter of undisputed fact that the Deputy filed the declaration on July 8, 2022, asserting certain facts. *Threshold Enters. v. Pressed Juicery, Inc.*, 445 F.Supp.3d 139, 146–147 (N.D. Cal. 2020).

For all these reasons, the Court finds the TAC sufficiently pleads that Deputy Aguirre lacked probable cause to arrest Ms. Granillo and thus violated her Fourth Amendment right.

### 2. Deputy Aguirre is not entitled to qualified immunity.

Because the TAC sufficiently pleads a constitutional violation against Deputy Aguirre, the next issue is whether the law was clearly established at the time of Ms. Granillo's arrest. Deputy Aguirre contends it was not. The Court disagrees.

As set forth above, the "clearly established" prong is a matter of law to be decided by a judge. *Reese v. County of Sacramento*, 888 F.3d 1080, 1037 (9th Cir. 2018). In evaluating whether a right is "clearly established," the "relevant, dispositive inquiry. . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the

situation he confronted." *Saucier*, 533 U.S. at 202. In determining whether a right is clearly established, courts "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." *Jessop v. City of Fresno*, 936 F.3d 937, 940–41 (9th Cir. 2019) (quoting *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005)); *Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002) (looking to "decisions of our sister Circuits, district courts, and state courts" in evaluating if law was clearly established).

"[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This is particularly true in the Fourth Amendment context, "where the Supreme Court has recognized that 'it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Reese*, 888 F.3d at 1038 (brackets omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

With regard to cases involving arrests based on a lack of probable cause, "[b]ecause the standard for probable cause is well settled, the question with respect to whether an unlawful arrest violated clearly established law is 'whether it is reasonably arguable that there was probable cause for arrest—that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." *Sialoi v. City of San Diego*, 823 F.3d 1223, 1233 (9th Cir. 2016) (quoting *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1076 (9th Cir. 2011).

Here, the TAC alleges Deputy Aguirre was aware the original restraining order had been downgraded to a peaceful contact order. (*TAC* ¶ 46.) The TAC also alleges that at the time of the arrest, Ms. Granillo and her boyfriend were peacefully sleeping. (*Id.* ¶ 45.)

16

Assuming the truth of these allegations, this case represents an obvious lack of probable cause, as no reasonable officer could disagree as to the legality of the arrest. Thus, Deputy Aguirre is not entitled to qualified immunity.[1]

### B.    Second Cause of Action – Section 1983 Deliberate Indifference

The second cause of action asserts a section 1983 claim for deliberate indifference to a serious medical need in violation of the Fourteenth Amendment. This claim is asserted against RN Vanbeekom, NP French, Dr. Grimaldi and Nurse Vargas-Pippins (the "Medical Provider Defendants"). The NaphCare Defendants argue this claim fails because they were not acting under the color of law. (*NaphCare Defs' MTD* [Doc. 45] 9:16–10:6.) In addition, all Defendants contend the claim is insufficiently pled because the TAC fails to allege a failure to act or deliberate indifference, and these medical providers are entitled to qualified immunity.  (*Id.* 10:7–12:28; *Cnty Defs' MTD* 18:21–24.)

#### 1.    *Acting Under Color of State Law*

NaphCare contends the "TAC fails to establish that Defendants NaphCare, French, and Grimaldi were acting under the color of law." (*NaphCare MTD* 2:1–2, 9:16–10:6.)

To state a violation of 42 U.S.C. § 1983, a plaintiff must plead facts demonstrating that (1) his constitutional rights were violated and (2) that defendants were acting under color of state law. *Long v. Cnty of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). Regarding the state-action prong, "[p]rivate persons, jointly engaged with state officials in the challenged action, are acting 'under color' of

---

[1] Plaintiffs' opposition cite cases holding reasonable suspicion—a lower standard than probable cause—does not exist if the officer is mistaken about whether the arrestee's conduct is unlawful. (*See Pls' Opp'n to Cnty Defs' MTD* 15:3–16.) These cases also support a finding that there was no probable cause to arrest Ms. Granillo.

17

law for purposes of § 1983 actions.'" *DeGrassi v. City of Glendora*, 207 F.3d 636, 647 (9th Cir. 2000) (quoting *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980)). The "determination of whether a nominally private person or corporation acts under color of state law 'is a matter of normative judgment, and the criteria lack rigid simplicity." *Pasadena Republican Club v. W. Just. Ctr*, 985 F.3d 1161, 1167 (9th Cir. 2021) (quoting *Rawson v. Recovery Innovations, Inc.*, 945 F.3d 742, 747 (9th Cir. 2020) (internal citation omitted)). "Courts must engage in 'sifting facts and weighing circumstances' to answer what is 'necessarily a fact-bound inquiry.'" *Id.* (quoting *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 939 (1982)).

There are four tests used to identify when a private party has acted under color of state law: (1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus. *Rawson*, 945 F.3d at 747. Regardless of the test used, "[a]t bottom, the inquiry is always whether the defendant has exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 747–748.

In *West v. Atkins*, 487 U.S. 42 (1988), the Supreme Court evaluated whether a physician under contract to provide medical care to inmates at a correctional facility acts under "color of state law." *Id.* at 43. The Court concluded that because the "delivery of medical treatment" to someone in custody is "state action fairly attributable to the State," the medical professional acts "under color of state law for purposes of § 1983." *Id.* at 57.

Here, the TAC alleges that in "June 2022, the Sheriff's Department contracted with Defendant Naphcare, Inc. and Naphcare San Diego, LLC for the provision of medical treatment to inmates at San Diego County Jails." (*TAC* ¶ 130.) The factual allegations also demonstrate that NaphCare's employees, NP French and Dr. Grimaldi, were providing medical services to Ms. Granillo while an inmate a San Diego County Jail. (*Id.* ¶¶ 62–72.) These allegations are sufficient to demonstrate that NaphCare and its employees were acting under color of state law.

18

### 2.    *The TAC sufficiently alleges deliberate indifference.*

Because Ms. Granillo was a pretrial detainee, whether Defendants failed to provide adequate medical care is evaluated under the Fourteenth Amendment, which requires facts demonstrating:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined [including a decision with respect to medical treatment];
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Sandoval v. County of San Diego*, 985 F.3d 657, 669 (9th Cir. 2021) (citing *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018)). With respect to the third element, "the plaintiff must show that the defendant's actions were 'objectively unreasonable,' which requires a showing of 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id.* (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

In *Gordon v. County of Orange*, 6 F.4th 961 (9th Cir. 2021), the Ninth Circuit evaluated whether a nurse at a correctional facility acted with deliberate indifference by failing to use the proper medical screening form to ensure the initiation of the medically appropriate protocol for an inmate, Matthew Gordon. *Id.* at 970. During Gordon's intake, he informed the registered nurse that he had a 3-gram-a-day heroin habit. Despite reporting his habit, "jail medical staff never utilized the COWS protocol," and instead a consulting physician ordered that Gordon be evaluated under CIWA for four days. Consistent with the physician's order, the nurse used the CIWA form to assess Gordon's

19

symptoms on his first day in custody. For approximately 10 hours after his initial intake—and while waiting to enter the general population—another inmate observed Gordon vomiting and dry heaving for 45 minutes. The nurse, however, did not assess Gordon during this timeframe. The next day, he was administered detoxification medication three time, but no CIWA or other evaluation was performed. Later that evening, deputies found Gordon unresponsive in his cell. He was taken to the hospital where he was pronounced dead.

In the lawsuit that followed, the district court found the nurse was entitled to qualified immunity on summary judgment. The Ninth Circuit reversed finding sufficient evidence to support deliberate indifference. The court explained that

> it was well settled that prison officials violate the Constitution when they choose a course of treatment that is 'medically unacceptable under all of the circumstances.' [Citations omitted.] In cases involving 'choices between alternative courses of treatment,' plaintiff 'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that 'they chose this course in conscious disregard of an excessive risk to plaintiff's health.' [Citation omitted.]

*Id.* Relying on principles drawn from previous cases involving the failure to properly screen inmates, the court concluded:

> … at a minimum, medical personnel at jail facilities are required to screen pretrial detainees for critical medical needs. Thus, at the time of the incident, Gordon had a clearly established constitutional right to have a proper medical screen conducted to ensure the medically appropriate protocol was initiated.

*Id.* at 971. Applying this precedent, the court found that the nurse was responsible for identifying Gordon's urgent medical needs, and having failed to do so, violated his right to adequate medical care. *Id.* at 972.

Here, Plaintiffs allege that Ms. Granillo's jail medical file from previous detentions included information indicating that she was an addict at risk of withdrawals and "was administered withdrawal medications immediately upon booking." (*TAC* ¶ 49.) This information was confirmed during Ms. Granillo's intake, when RN Vanbeekom "noted"

her "recent use of alcohol, heroin, prescription pain medications or sedative," that she
used "2 grams of Fentanyl daily" for the last 6 months, and that she drank "every night
with her last drink occurring last night." (*Id.* ¶ 57.) RN Vanbeekom also "noted Ms.
Granillo had a history or risk or alcohol or drug withdrawal…." (*Id.*) And NP French also
noted Ms. Granillo's "daily" or "significant" use of opioids. (*Id.* ¶¶ 60, 62.)

Based on the above allegations, it is reasonable to infer that the information in Ms.
Granillo's jail medical file demonstrated that she was at risk of withdrawals from opioids
or alcohol. Despite this risk, Plaintiffs allege Ms. Granillo was never scored under COWS
(or CIWA-Ar) and, despite NP French's order, Ms. Granillo never received her
withdrawal medications. (*Id.* ¶ 73.) Instead, Ms. Granillo only received a single dose of
buprenorphine, three days after intake. (*Id.* ¶ 72.)

In light of the above allegations, the TAC easily states a claim against Dr. Grimaldi
and Nurse Vargas-Pippins. The allegations indicate that by the time these medical
provider Defendants evaluated Ms. Granillo (1) the information in her jail medical file
notified them that she was at risk for opioid and alcohol withdrawal, (2) Ms. Granillo had
still not been assessed under COWS or CIWA-Ar and (3) she had not received the
medications ordered by NP French to treat the withdrawal symptoms. Because the TAC
indicates neither Dr. Grimaldi nor Nurse Vargas-Pippins did anything to correct the
failure to adequately monitor and treat Ms. Granillo's withdrawal from opioids or
alcohol, the TAC alleges a claim for deliberate indifference.

As for RN Vanbeekom and NP French, the issue is much closer. The difficulty has
to do with the lack of clarity regarding whether these medical providers were tasked only
with identifying that Ms. Granillo was at risk of withdrawals in anticipation that other
nurses or medical providers would then assess her under COWS or CIWA-Ar and
administer any necessary medication. If so, then it would be difficult to find either were
deliberately indifferent because the information they entered in Ms. Granillo's medical
file identified her as at risk for withdrawals. If not, then under *Gordon*, it would be

21

1    reasonable to infer that they too violated Ms. Granillo's constitutional right to have a

2    proper medical screen to ensure the medically appropriate protocol was initiated.

3           With this in mind, there are no allegations in the TAC suggesting that after Ms.

4    Granillo's initial evaluations, she was seen by another medical provider until Dr.

5    Grimaldi two days later. Because all reasonable inferences are drawn in Plaintiffs' favor,

6    at this stage it is reasonable to infer RN Vanbeekom and NP French were not simply

7    charged with identifying her symptoms but also evaluating her under COWS or CIWA-

8    Ar and administering medications to treat the withdrawal symptoms. For this reason, the

9    Court finds the TAC also alleges claims against RN Vanbeekom and NP French.

10

11           **3.    *The medical provider Defendants are not entitled to qualified***

12                   ***immunity.***

13           Because this Court has found the TAC sufficiently alleges a constitutional

14    violation against the medical provider Defendants, the next issue is whether the law was

15    clearly established at the time of Ms. Granillo's detention. As set forth above, under

16    *Gordon*, 6 F.4th 961, when Ms. Granillo was being screened, the law was established that

17    inmates have a constitutional right to have a proper medical screen conducted to ensure

18    the medically appropriate protocol is initiated. Accordingly, the medical provider

19    defendants are not entitled to qualified immunity.

20

21           **C.    <u>Third Cause of Action – *Monell* liability</u>**

22           The third cause of action asserts a claim under *Monell v. Dep't of Soc. Servs. of*

23    *City of New York*, 436 U.S. 658 (1978), for an unconstitutional custom related to medical

24    treatment and monitoring against the County and NaphCare. Both Defendants argue the

25    cause of action should be dismissed because the TAC does not allege a deliberately

26    adopted policy or custom that resulted in the violation of Ms. Granillo's constitutional

27    rights. (*County Def's P&A* at 30:1-5.)

28

Under *Monell*, municipalities are not vicariously liable under section 1983 for their employees' actions. *Id.* 436 U.S. at 692. Instead, "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 38 (1989) (emphasis in original). Thus, to be liable under section 1983 for a *Monell* claim, plaintiffs must show: (1) "a [municipal] employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity;" (2) "the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy;" or (3) "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Mendoza v. County of San Bernardino*, 2020 WL 2066142, at *6 (C.D.Cal. 2020) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)).

To state a *Monell* claim based on an unconstitutional pattern and practice, plaintiff must allege facts showing defendants acted pursuant to a custom that is so "persistent and widespread" that it establishes a "permanent and well settled city policy." *See Monell*, 436 U.S. at 690–91. A municipal policy exists when "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). In the absence of an express policy, an unconstitutional pattern or practice may be inferred from pervasive evidence of "repeated constitutional violations" that are closely related to the alleged unconstitutional pattern and practice. *Gillette*, 979 F.2d at 1349; *Oviatt v. Pearce*, 954 F.2d 1470, 1481 (9th Cir. 1992).

In *Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1194 (9th Cir. 2002), the Ninth Circuit held that a jury could find that 'the nurse's constitutional violation arguably resulted from an omission in the County's policy regarding the handling of prescription

medication." *Id.* at 1194. The court explained that "[w]hen policymakers know that their medical staff members will encounter those with urgent mental health needs yet fail to provide for the identification of those needs, it is obvious that a constitutional violation could well result." *Id.* at 1196.

Similar to *Gibson*, the TAC sufficiently alleges a *Monell* claim based on the County's failure to institute an adequate policy to deal with inmates suffering from opiate and alcohol withdrawal. As Plaintiffs point out in the opposition, the TAC alleges the County's policymakers knew it would frequently encounter inmates suffering from alcohol and drug withdrawal. For example, Plaintiffs allege that Dr. Montgomery estimated that 70% of inmates have some form of addiction or substance use issue and that the percentage is increasing over time. (*TAC* ¶¶ 102–107, 110, 177, 186.) The TAC also alleges the County was aware in 2021, the year before Ms. Granillo died, that approximately 83% of adults arrested tested positive for one or more controlled substances. (*Id.* ¶ 111.) Given these figures, it is reasonable to infer the County was aware that inmates would suffer from alcohol or drug withdrawal.

Next, the TAC alleges facts demonstrating the County knew that its existing custom or policy of dealing with inmates at risk of withdrawal was insufficient. This notice was provided by (1) the 2017 NCCHC audit and review, which found the County's policies for drug and alcohol withdrawal was insufficient; (2) the death of Elisa Serna; and (3) the deaths of seven inmates resulting from the failure to treat their withdrawals (*TAC* ¶¶ 91–107, 186). The TAC also contends the NCCHC report notified the County of the need to implement COWS and CIWA-Ar scoring. (*Id.* ¶¶ 95, 191.) For these reasons, the Court finds the TAC adequately alleges *Monell* claims against the County.

As for NaphCare, it contends the TAC fails to allege a custom and practice against it because NaphCare's contract with the County for medical services was in place for less than 30 days before Ms. Granillo died. (*NaphCare MTD* 14:2–13.) Thus, NaphCare contends the incidents that demonstrate the County's custom and practice do not apply to NaphCare. (*Id.*)

24

Plaintiffs respond that the amount of time that elapsed between NaphCare's contract and Ms. Granillo's death is immaterial because when she died, NaphCare was responsible for the County's medical services and thus it was NaphCare's inadequate policy that was in place. (*Opp'n to NaphCare MTD* 15:12–17.) As support, Plaintiffs also point out that not only was NaphCare aware of the problems with the County's medical services before entering the contract, but it was specifically hired to address those issues. Because, according to Plaintiffs, NaphCare failed to address the issues, which resulted in Ms. Granillo's death, NaphCare is liable under *Monell*.

As an initial matter, neither party has cited a case on point. Nevertheless, at this point in the litigation, the Court is persuaded by Plaintiffs' theory. Under *Monell*, a pattern of constitutional violations resulting from existing practices is necessary because it demonstrates that the County had notice. *Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141-42 (9th Cir. 2020). Similarly, with regard to NaphCare, the 2017 NCCHC audit, Ms. Serna's death, and the death of the other inmates demonstrates NaphCare was on notice of the pattern or practice of failing to adequately treat and monitor inmates at risk of withdrawal. And, given Ms. Granillo's death, it is reasonable to infer NaphCare took no steps to remedy the practice.

For these reasons, the Court finds the TAC sufficiently alleges a *Monell* claim against the County and NaphCare.

### D.    Fourth, Fifth & Sixth Causes of Action

The County Defendants seek to dismiss the fourth (14th Amendment failure to train, supervise and discipline), fifth (14th Amendment failure to promulgate constitutionally adequate policies and protocols) and sixth (deprivation of familial association) causes of action against the Supervisor Defendants. (*Cnty Defs' MTD* 24:15–27:7.) Regarding each of these causes of action, Defendants argue the TAC fails to allege an intentional decision by any of the Supervisor Defendants and simply lumps them all together. (*Id.* 25:27–28, 26:7–16.)

25

Plaintiffs respond that the causes of action are sufficiently pled because the TAC "alleges specific facts that gave" the Supervisor Defendants "notice of deficiencies in the treatment protocols for drug and alcohol withdrawal and deficiencies in the training and supervision of subordinates regarding treatment of ill inmates." (*Opp'n to Cnty Defs' MTD* 28:22–26.) As support, Plaintiffs point to the TAC's allegations that the Supervisor Defendants were aware of the 2017 NCCHC report, the February 2022 State Auditor's report, and the death of Elisa Serna. (*Opp'n to Cnty Defs' MTD* at 28:26–29:1.)

The County's reply responds that the causes of action are insufficiently pled because the TAC's factual allegations do not show the Supervisor Defendants' "participation in, direction of, or knowledge of the alleged violations committed against Granillo and a failure to prevent them." (*County Defs' Reply* [Doc. 52] 12:21–23, 13:3–4, 13:12–14.) In other words, because "Plaintiffs only allege the Supervisory Defendants had knowledge of past incidents at the jails, and do not allege that such Defendants actually knew about Granillo's arrest, detainment, or treatment at the jail facilities," the claims cannot survive. (*Id.* at 14:1–4.)

The County's contention that the TAC must plead facts demonstrating they had specific knowledge about Ms. Granillo's arrest, detainment and treatment lacks merit. In *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011), plaintiff Dion Starr alleged that while in custody at the Los Angeles County Jail, a group of inmates gathered outside his cell and threatened to inflict physical harm. Starr yelled for deputies to help, but instead they opened his cell door, allowing the inmates to enter and stab him 23 times. Eventually, deputies entered Starr's cell, where he was laying on the floor, bleeding and moaning. One deputy repeatedly kicked Starr's face, nose and body, while yelling racial expletives. *Id.* at 1204.

Starr sued Sheriff Leroy Baca, in his individual capacity, and several of the sheriff deputies. The claim against Baca was based on the allegation that he knew or should have known about the dangers of inmate-on-inmate violence in the County jail, and that he was deliberately indifferent to those dangers. The district court granted Baca's motion to

26

dismiss finding Starr failed to "allege that Baca himself directly participated in any way in the January 27, 2006 incident or that he was involved in any review or investigation of it." *Id.* at 1205.

The Ninth Circuit reversed, explaining that "[w]e have long permitted a plaintiff to hold supervisors individually liable in § 1983 suits when culpable action, or inaction, is directly attributed to them. We have never required a plaintiff to allege that a supervisor was physically present when the injury occurred." *Id.* at 1205. Instead, the supervisor's participation could include his "own… inaction in the training, supervision, or control of his subordinates,' 'his acquiescence in the constitutional deprivations of which the complaint is made,' or 'conduct that showed a reckless or callous indifference to the rights of others.'" *Id.* at 1205–06 (citations omitted). Turning to the complaint's allegations, the Ninth Circuit found the complaint sufficiently alleged a claim against Sheriff Baca based on his alleged knowledge—through reports regarding systematic problems in the jails—of previous incidents in which inmates had been killed or injured because of culpable actions by the Sheriff's subordinates. *Id.* at 1209–12, 1216.

Here, the County raises the same argument rejected in *Starr*—i.e., that the claim fails because the TAC does not allege the Supervisor Defendants directly participated in or knew of Ms. Granillo's arrest, detainment and treatment. Because the TAC sufficiently alleges (1) the Supervisor Defendants were aware of the deficiencies with the County's policies and practices for screening and monitoring inmates suffering from withdrawals and (2) those deficiencies led to Ms. Granillo's death, the TAC sufficiently alleges deliberate indifference against the Supervisor Defendants.[2]

---

[2] The County raises two additional arguments regarding the fourth cause of action. First, it argues the TAC fails to allege a policy or custom that violated Ms. Granillo's constitutional rights. For the reasons discussed in the previous section, this argument is unavailing. Second, the County argues the failure to train theory is insufficiently pled. Because the fourth cause of action is plausible under the failure to supervise theory, the Court need not consider the failure to train theory.

24-cv-0071 W (SBC)

1

E.    **Seventh & Eighth Causes of Action – Bane Act & Negligence**

2    County Defendants argue the TAC fails to allege facts stating a Bane Act and

3    negligence cause of action. In the opposition, Plaintiffs agree to dismiss these causes of

4    action against the County Defendants. (*Opp'n to Cnty Defs' MTD* [Doc. 51] 15:25–27,

5    32:7–13.[3]) Accordingly, the Court will dismiss these causes of action as to the County

6    Defendants.

7    NaphCare also argues these causes of action should be dismissed because Plaintiffs

8    failed to comply with California's Government Tort Claims Act. Plaintiffs argue

9    NaphCare, as a private entity, is not protected by the Act. Plaintiffs are correct.

10    California Government Code § 945.4 provides the following:

11    Except as provided in Sections 946.4 and 946.6, no suit for money or
12    damages may be brought against a *public entity* on a cause of action for
       which a claim is required to be presented in accordance with Chapter 1
13    (commencing with Section 900) and Chapter 2 (commencing with Section
       910) of Part 3 of this division until a written claim therefor has been
14    presented to the *public entity* and has been acted upon by the board, or has
       been deemed to have been rejected by the board, in accordance with
15    Chapters 1 and 2 of part 3 of this division.

16

17    *Id.*, emphasis added. Accordingly, the issue raised in NaphCare's motion is whether a

18    private entity charged with operating services in a County facility is considered a "public

19    entity" under section 945.4. In *Lawson v. Superior Court*, 180 Cal.App.4th 1372 (2010),

20    the California Court of Appeals answered this question in the negative.

21    In *Lawson*, petitioner and her infant daughter, Esperanza, were in a 40-bed

22    correctional facility for women prisoners with young children. Center Point, Inc., a

23    private entity, operated the facility through a contract with the California Department of

24    Corrections and Rehabilitation. The complaint alleged that Esperanza developed severe

25

26    ─────────────────────────

27    [3] The opposition does not specifically identify the County Supervisor Defendants. Nevertheless, the
       opposition fails to address the County's argument that these causes of action fail because Plaintiffs did
       not comply with the Government Tort Claims Act. (*See Cnty Defs' MTD* 32:24–33:19.) The Court
28    interprets Plaintiffs' silence as a concession on the merits of the County's argument.

respiratory problems and, over the course of 11 days, Center Point and two employees repeatedly denied requests for treatment. Although she was eventually taken to the hospital, the delay in treatment led to Esperanza suffering from hypoxia, double pneumonia, cardiac arrest, scaring and injury to both lungs, among other things.

In the lawsuit that followed, Center Point, Inc. and its employees moved to dismiss the state causes of action arguing they were entitled to immunity under the California Tort Claims Act. The superior court agreed and granted the motion. Plaintiffs filed a petition for writ of mandate, which the Court of Appeal granted. With regard to Center Points contention that it was immune under the Tort Claims Act, the court stated:

> The Petition cites no authority, and we are aware of none, that extends the governmental immunity set forth in the Tort Claims Act to a private entity working under contract for the state, or indeed that extends governmental immunity beyond the types of entities described in Government Code section 811.2. Accordingly, we conclude that Center point is not a "public entity" and thus is not entitled to claim the immunity set forth in the Tort Claims Act.

*Id.* at 1397. Because Center Point is not a public entity, the Court of Appeal also held that its employees "are not 'public employees' and are not covered by the liability and immunity provisions of the Tort Claims Act." *Id.* at 1398.

Here, the TAC alleges NaphCare is a private entity. Accordingly, neither NaphCare nor its employees are protected by the immunity under the California Tort Claims Act.

Finally, NaphCare also argues these causes of action fail because the TAC, in essence, does not adequately allege facts demonstrating either NaphCare or its employees' liability for a Bane Act violation or negligence. For the reasons set forth above regarding deliberate indifference, the Court finds the TAC sufficiently alleges Bane Act and negligence claims.

## F.     Ninth Cause of Action – wrongful death

The ninth cause of action for wrongful death is alleged against all Defendants. Because the County Defendants' motion raises additional issues, the Court will evaluate the County Defendants and NaphCare Defendants arguments separately.

### 1.     The County Defendants

County Defendants argue the wrongful death cause of action should be dismissed for several reasons. First, they contend immunity under Government Code § 845.6, which provides "for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody."  The only exception is where "the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." *Id.*

Plaintiffs respond by pointing out that the TAC alleges that when the Doe Defendants found Ms. Granillo unresponsive on the toilet in her cell, they failed to perform CPR, administer oxygen, use the automated defibrillator, or take any other life-saving action. (*TAC* ¶¶ 159–160.) As a result, Ms. Granillo went without medical intervention and oxygen for 13 minutes. (*Id.* ¶¶ 161–162.)  The TAC also alleges Ms. Granillo suffered severe anoxic brain injury as a result of the failure to summon immediate medical attention. (*Id.* ¶ 163.) Plaintiffs also point out that Defendants have failed to cite any authority supporting the proposition that waiting 13 minutes to summon medical attention satisfies the standard. (*Opp* 33:8–9.)

County Defendants' reply fails to address Plaintiffs' argument and instead urges dismissal for a different reason: Plaintiffs alleged failure to comply with the Government Tort Claims Act. (*Cnty Defs' Reply* at 15:6–16.) But the TAC alleges Plaintiff A.A. submitted a timely tort claim with the County of San Diego, which was rejected on July 10, 2023. (*Opp'n to Cnty Defs' MTD* 32:17–20, citing *TAC* ¶ 18.) Thus, the Court will deny the County Defendants' motion to dismiss this claim.

Next, the County Defendants argue Plaintiffs failed to allege facts supporting the wrongful-death claim against Deputy Aguirre. This argument consists of a single paragraph with no citations to law. (*Cnty Defs' MTD* 18:11–20.) Instead, they simply assert that none of the TAC's allegations regarding duty and breach pertain to Deputy Aguirre, and that the TAC fails to plead proximate cause. (*Id.* 12–15.) Plaintiffs' response is also conclusory, simply asserting the claim is adequately pled. (*Opp'n to Cnty Defs' MTD* 15:25–16:8.)

County Defendants are the moving party and thus bear the burden of persuasion. Their conclusory paragraph with no legal citations, fails to satisfy this burden. Accordingly, the motion to dismiss wrongful-death claim fails.

### 2. *The NaphCare Defendants.*

NaphCare argues the wrongful death claim should be dismissed because the "TAC is devoid of any facts regarding NaphCare, or its agents, breached a duty" to Ms. Granillo or "any theory of vicarious liability…." (*NaphCare Defs' MTD* 22:4–8.) For the reasons discussed regarding deliberate indifference, this argument lacks merit.

### G. <u>The FAC provides sufficient notice against the Doe Defendants</u>

NaphCare and the County challenge the TAC's Doe pleading. While the Federal Rules of Civil Procedure do not explicitly allow the naming of fictious or anonymous parties, "where the identity of the alleged defendant is not known prior to the filing of a complaint, the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds." *Hernandez v. San Bernardino Cnty.*, 2023 WL 3432206, at *3 (C.D. Cal. Jan. 26, 2023) (quoting *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999)). Still, a "section 1983 action must allege how each individual defendant directly participated in the violation of the plaintiff's rights." *Id.* Thus, while a plaintiff "may refer to unknown defendants as Defendant John

31

Doe 1, John Doe 2, John Doe 3 and so on . . . he must allege specific facts showing how each particular doe defendant violated his rights." *Keavney v. Cnty. of San Diego*, 2020 WL 4192286, at *4 (S.D. Cal. July 21, 2020). The reason behind these requirements is to give named defendants like the County "crucial notice of the nature of the claims" at issue. *Mendoza v. Cnty. of San Bernardino*, 2020 WL 2066142, at *4 (C.D. Cal. Feb. 21, 2020) (holding that the pleadings must be "sufficient to describe the involvement" of doe defendants and to put "the County on notice of the nature of the claim against it.").

As demonstrated by the factual background section of this order, this is not a case where the complaint includes few factual allegations. To the contrary, the TAC is extremely detailed and provides more than enough information to place Defendants on notice regarding the nature of the claims against the Doe Defendants. Accordingly, Defendants' motions to dismiss Doe Defendants are denied.

## V.    CONCLUSION & ORDER

For the reasons stated above, the Court **DENIES** the NaphCare Defendants' motion to dismiss [Doc. 45, 48] and **DENIES IN PART** and **GRANTS IN PART** the County Defendants' motion to dismiss [Doc. 43] as follows: the seventh and eighth causes of action are **DISMISSED WITHOUT LEAVE TO AMEND** as to the County Defendants.

**IT IS SO ORDERED.**

Dated:  September 30, 2025

Hon. Thomas J. Whelan
United States District Judge

24-cv-0071 W (SBC)